1 | **ELIZABETH BARROS**
California State Bar No. 227629
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, California  92101-5030
Telephone:    (619) 234-8467
4 | Facsimile:    (619) 687-2666

5 | Attorneys for Mr. Alferes

6 |

7 |

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE WILLIAM Q. HAYES)**

11 | UNITED STATES OF AMERICA,

Case No.:  08CR1268-WQH

12 |     Plaintiff,

Date:    June 2, 2008
Time:    2:00 p.m.

13 | v.

14 | MANUEL ALBERTO ALFERES,

DEFENDANT'S NOTICE OF MOTION AND MOTION  TO:

15 |     Defendant.

16 |

1)    COMPEL DISCOVERY;
2)    DISMISS INDICTMENT DUE TO MISINSTRUCTION OF THE GRAND JURY; AND

17 |

18 |

3)    GRANT LEAVE TO FILE FURTHER MOTIONS

19 |

20 | TO:    KAREN P. HEWITT, UNITED STATES ATTORNEY; AND
PAUL L. STARITA, ASSISTANT UNITED STATES ATTORNEY:

21 |

22 |     **PLEASE TAKE NOTICE** that on the above-captioned date and time, or as soon thereafter as

23 | counsel may be heard, the defendant, Manuel Alberto Alferes, by and through his counsel, Elizabeth M.

24 | Barros and Federal Defenders of San Diego, Inc., will ask this Court to enter an order granting the motions

25 | listed below.

26 | //

27 | //

28 | //

## MOTIONS

Manuel Alberto Alferes, the defendant in this case, by and through his attorneys, Elizabeth M. Barros, and Federal Defenders of San Diego, Inc., pursuant to the United States Constitution, the Federal Rules of Criminal Procedure, and all other applicable statutes, laws, case law, and rules, hereby moves this Court for an order:

1)  compelling production of discovery;

2)  dismissing the indictment due to misinstruction of the grand jury; and

3)  granting leave to file further motions.

These motions are based upon the instant motions and notice of motions, the attached statement of facts and memorandum of points and authorities, and any and all other materials that may come to this Court's attention at the time of the hearing on these motions.

Respectfully submitted,


/s/ Elizabeth M. Barros
Dated: May 30, 2008                    **ELIZABETH BARROS**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Alferes

1   **ELIZABETH BARROS**
    California State Bar No. 227629
2   **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
    225 Broadway, Suite 900
3   San Diego, California  92101-5030
    Telephone:  (619) 234-8467
4   Facsimile:   (619) 687-2666

5   Attorneys for Mr. Alferes

6

7

8                   UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                 **(HONORABLE WILLIAM Q. HAYES)**

11   UNITED STATES OF AMERICA,         Case No.: 08CR1006-BTM

12         Plaintiff,

13   v.                         **STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTIONS**

14   MANUEL ALBERTO ALFERES,

15         Defendant.

16

17                             I.

18                     **STATEMENT OF FACTS**[1]

19        On February 19, 2008, Mr. Alferes was arrested.  On April 23, 2008, the January 2007 Grand Jury

20 issued an indictment charging Mr. Alferes with attempted entry after deportation in violation of 8 U.S.C.

21 § 1326 (a) and (b).

22        To date, counsel for Mr. Alferes has received 105 pages of discovery.  Counsel has not been able to

23 locate Mr. Alferes, who should have been transported to San Diego from El Centro, to review the discovery

24 received thus far with him.  Moreover, counsel is still awaiting additional discovery, including the audio

25 cassette tapes for Mr. Alferes' alleged deportation.

26 //

27

28

---

[1]  This statement of facts is based on the complaint and indictment filed by the government and the discovery provided by the government.  Mr. Alferes does not accept this statement as his own, and reserves the right to take a contrary position at motions and trial.

**II.**

## MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE

Defendant moves for the production of the following discovery. This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies." See United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

(1) The Defendant's Statements. The government must disclose to the defendant all copies of any written or recorded statements made by the defendant; the substance of any statements made by the defendant which the government intends to offer in evidence at trial; any response by the defendant to interrogation; the substance of any oral statements which the government intends to introduce at trial and any written summaries of the defendant's oral statements contained in the handwritten notes of the government agent; any response to any Miranda warnings which may have been given to the defendant; as well as any other statements by the defendant. Fed. R. Crim. P. 16(a)(1)(A) and 16(a)(1)(B). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal all the defendant's statements, whether oral or written, regardless of whether the government intends to make any use of those statements. See also United States v. Bailleaux, 685 F.2d 1105, 1113-1114 (9th Cir. 1982).

(2) Arrest Reports, Notes and Dispatch Tapes. Defendant also specifically requests the government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate to the circumstances surrounding the defendant's arrest and any questioning. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained. Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A), Fed. R. Crim. P. 16(a)(1)(B), and Brady v. Maryland, 373 U.S. 83 (1963). The government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant. See Fed. R. Crim. P. 16(a)(1)(E), Fed. R. Crim. P. 26.2, and United States v. Riley, 189 F.3d 802, 806-808 (9th Cir. 1999). Preservation of rough notes is requested, whether or not the government deems them discoverable.

(3) Brady Material. The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the

1  government's case.  Under <u>Brady</u>, impeachment as well as exculpatory evidence falls within the definition

2  of evidence favorable to the accused.  <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>,

3  427 U.S. 97 (1976).

4  (4) <u>Any Information That May Result in a Lower Sentence Under The Guidelines</u>.  The government

5  must produce this information under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

6  (5) <u>The Defendant's Prior Record</u>.  The defendant requests disclosure of all alleged prior criminal

7  convictions and law enforcement contacts, if any.  Fed. R. Crim. P. 16(a)(1)(D).

8  (6) <u>Any Proposed 404(b) Evidence</u>.  To the extent that there is any such evidence, the government

9  must produce evidence of prior similar acts under Fed. R. Evid. 404(b) and "shall provide reasonable notice

10  in advance of trial . . . of the general nature" of any evidence the government proposes to introduce under Fed.

11  R. Evid. 404(b) at trial.   <u>See</u> <u>United States v. Vega</u>, 188 F. 3d 1150, 1154-1155 (9th Cir. 1999).  The

12  defendant requests that such notice be given three weeks before trial in order to give the defense time to

13  adequately investigate and prepare for trial.

14  (7) <u>Evidence Seized</u>.  The defendant requests production of evidence seized as a result of any search,

15  either warrantless or with a warrant.  Fed. R. Crim. P. 16(a)(1)(D).

16  (8) <u>Request for Preservation of Evidence</u>.  The defense specifically requests that all dispatch tapes

17  or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody or

18  care of the government and which relate to the arrest or the events leading to the arrest in this case be

19  preserved.

20  (9) <u>Henthorn Material</u>.  The defendant requests that the Assistant United States Attorney ("AUSA")

21  assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved

22  in the present case, and produce to him any exculpatory information and impeachment material at least two

23  weeks prior to trial and one week prior to the motion hearing.  <u>See</u> <u>Kyles v. Whitley</u>, 514 U.S. 437, 438 (1995)

24  (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others

25  acting on the government's behalf in the case, including the police"); <u>United States v. Henthorn</u>, 931 F.2d 29

26  (9th Cir. 1991); <u>see also</u> <u>United States v. Jennings</u>, 960 F.2d 1488 (9th Cir. 1992) (AUSA may not be ordered

27  to personally conduct examination of records; appropriate government agency may review files and notify

28  AUSA of contents as long as AUSA makes the determination regarding material to be disclosed); <u>United</u>

1    States v. Herring, 83 F.3d 1120 (9th Cir. 1996) (accord).  In addition, the defendant requests that if the
2    government is uncertain whether certain information is to be turned over pursuant to this request, that it
3    produce such information to the Court in advance of the trial and the motion hearing for an in camera
4    inspection.

5         (10)  Tangible Objects.  The defendant requests the opportunity to inspect, copy, and test, as necessary,
6    all other documents and tangible objects, including photographs, books, papers, documents, alleged narcotics,
7    fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended for
8    use in the government's case-in-chief or were obtained from or belong to the defendant.  Fed. R. Crim. P.
9    16(a)(1)(E).  **Specifically, defendant requests copies of his immigration files as well as any recordings**
10   **of his alleged prior removals.**

11        (11)  Expert Witnesses.  Defendant requests the name, qualifications, and a written summary of the
12   testimony of any person that the government intends to call as an expert witness during its case in chief.  Fed.
13   R. Crim. P. 16(a)(1)(G).  Defendant requests the notice of expert testimony be provided at a minimum of two
14   weeks prior to trial so that the defense can properly prepare to address and respond to this testimony, including
15   obtaining its own expert and/or investigating the opinions, credentials of the government's expert and a
16   hearing in advance of trial to determine the admissibility of qualifications of any expert.  See Kumho v.
17   Carmichael Tire Co., 526 U.S. 137, 119 S.Ct. 1167, 1176 (1999) (trial judge is "gatekeeper" and must
18   determine, reliability and relevancy of expert testimony and such determinations may require "special briefing
19   or other proceedings").

20        (12)  Impeachment Evidence.  The defendant requests any evidence that any prospective government
21   witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has
22   made a statement favorable to the defendant.  See Fed. R. Evid. 608, 609 and 613; Brady v. Maryland, 373
23   U.S. 83 (1963); United States v. Strifler, 851 F.2d 1197, 1201-1202 (9th Cir. 1988); Thomas v. United States,
24   343 F.2d 49, 53-54 (9th Cir. 1965).

25        (13)  Evidence of Criminal Investigation of Any Government Witness.  The defendant requests any
26   evidence that any prospective witness is under investigation by federal, state or local authorities for any
27   criminal conduct.

28   //

(14)  Evidence of Bias or Motive to Lie.  Defendant requests any evidence that any prospective Government witness is biased or prejudiced against Defendant, or has a motive to falsify or distort his or her testimony. Pennsylvania v. Ritchie, 480 U.S. 39, 57-58 (1987); United States v. Strifler, 851 F.2d 1197, 1201-1202 (9th Cir. 1988).

(15)  Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.  The defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic.  See United States v. Strifler, 851 F.2d 1197, 1201-1202 (9th Cir. 1988).

(16)  Witness Addresses.  The defendant requests the name and last known address of each prospective government witness.  See United States v. Cook, 608 F.2d 1175, 1181 (9th Cir. 1979) (defense counsel has equal right to talk to witnesses).  The defendant also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a government witness.  United States v. Cadet, 727 F.2d 1453 (9th Cir. 1984).

(17)  Name of Witnesses Favorable to the Defendant.  The defendant requests the name of any witness who made an arguably favorable statement concerning the defendant or who could not identify him or who was unsure of his identity, or participation in the crime charged.

(18)  Statements Relevant to the Defense.  The defendant requests disclosure of any statement relevant to any possible defense or contention that he might assert.  United States v. Bailleaux, 685 F.2d 1105 (9th Cir. 1982).  This includes all statements by percipient witnesses.

(19)  Jencks Act Material.  The defendant requests production in advance of trial of all material, including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2.  Advance production will avoid the possibility of delay at trial to allow the defendant to investigate the Jencks material.  A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1). Campbell v. United States, 373 U.S. 487, 490-92 (1963). In United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) the Ninth Circuit held that when an agent goes over interview notes with the subject of the interview the notes are then subject to the Jencks Act.  See also United States v. Riley, 189 F.3d 802,

806-808 (9th Cir. 1999). Defendant requests pre-trial disclosure of such statements to avoid unnecessary recesses and delays for defense counsel to properly use any Jencks statements and prepare for cross-examination.

(20) <u>Giglio Information & Agreements Between the Government and Witnesses</u>. Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the defendant requests all statements and/or promises, express or implied, made to any witness, in exchange for their testimony in this case, and all other information which could be used for impeachment.

(21) <u>Agreements Between the Government and Witnesses</u>. The defendant requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective government witness and the government (federal, state and/or local). This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed.

(22) <u>Informants and Cooperating Witnesses</u>. The defendant requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against the defendant. The government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense. <u>Roviaro v. United States</u>, 353 U.S. 52, 61-62 (1957). The government must disclose any information derived from informants which exculpates or tends to exculpate the defendant.

(23) <u>Bias by Informants or Cooperating Witnesses</u>. The defendant requests disclosure of any information indicating bias on the part of any informant or cooperating witness. <u>Giglio v. United States</u>, 405 U.S. 150 (1972). Such information would include what, if any, inducements, favors, payments or threats were made to the witness to secure cooperation with the authorities.

(24) <u>Personnel Records of Government Officers Involved in the Arrest</u>. Defendant requests all citizen complaints and other related internal affairs documents involving any of the immigration officers or other law enforcement officers who were involved in the investigation, arrest and interrogation of Defendant. <u>See</u>

1  Pitchess v. Superior Court, 11 Cal. 3d 531, 539 (1974).  Because of the sensitive nature of these documents,

2  defense counsel will be unable to procure them from any other source.

3          (25)  Training of Relevant Law Enforcement Officers.  Defendant requests copies of all written,

4  videotaped or otherwise recorded policies or training instructions or manuals issued by all law enforcement

5  agencies involved in the case (United States Customs Service, Border Patrol, DHS, Imperial Beach Sheriff's

6  Department, etc.) to their employees regarding:  (1) the informing of suspects of their Constitutional rights;

7  (2) the questioning of suspects and witnesses.

8          (26)  Residual Request.  The defendant intends by this discovery motion to invoke his rights to

9  discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution

10  and laws of the United States.  The defendant requests that the government provide him and his attorney with

11  the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-

12  examination.

13                                                  **III.**

14  **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS
    AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH**

15  **_NAVARRO-VARGAS_ AND _WILLIAMS_ AND VIOLATE THE FIFTH AMENDMENT BY
    DEPRIVING MR. ALFERES OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

16

17  **A.     Introduction.**

18          The indictment in the instant case was returned by the January 2007 grand jury.  That grand jury was

19  instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  See

20  Reporter's Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as

21  Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in

22  the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in

23  several ways.[2]  These instructions compounded Judge Burns's erroneous instructions and comments to

24  prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions

25  //

26  _____

27          [2]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States
    v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005)

28  (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-
    Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

1  at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached

2  hereto as Exhibit B.[3]

3      **1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to
               Determine Whether or Not Probable Cause Exists and That They Have
4              No Right to Decline to Indict When the Probable Cause Standard Is
               Satisfied.**
5

6      After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

7  responsibility, see Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from

8  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

9  federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See id.

10  at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

11  judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

12  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

13  be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

14  because the grand jurors disagree with a proposed prosecution.

15      Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

16  to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

17          I've gone over this with a couple of people.  You understood from the
            questions and answers that a couple of people were excused, I think three in
18          this case, because they could not adhere to the principle that I'm about to tell
            you.
19

20  Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

21  disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

22  view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

23      Examination of the voir dire transcript, which contains additional instructions and commentary in the

24  _____

25      [3]  The transcript of the voir dire indicates that grand jurors were shown a video
26  presentation on the role of the grand jury.  Mr. Alferes requests that the video presentation be
    produced.  See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he
27  proceedings before the grand jury are secret, but the ground rules by which the grand jury
    conducts those proceedings are not.").
28

      [4]  See also id. at 20 ("You're all about probable cause.").

form of the give and take between Judge Burns and various prospective grand jurors, reveals Judge Burns's emphasis on the singular duty to determine whether or not probable cause exists, and his statement that grand jurors cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. In this passage, Judge Burns twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause. Because of the redactions of the grand jurors' names, Mr. Alferes will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's

probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that he would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See id. Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's question provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. . . .

Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id. That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

1   I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone
2   different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to
3   follow it here."

4   You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of
5   congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
    That's not what your prerogative is here. You're prerogative instead is to act
6   like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that
7   this person's involved? It does." *And then your obligation, if you find those*
8   *to be true, would be to vote in favor of the case going forward.*

9   Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both

10  questions are answered in the affirmative, lead to an "obligation" to indict.

11      Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

12  paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

13  to indict in every case in which there was probable cause.

14      The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug
15      offense?
        REA: It would depend on the case.
16      The Court: Is there a chance that you would do that?
        REA: Yes.
17      The Court: I appreciate your answers. I'll excuse you at this time.

18  Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his

19  political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

20  should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

21  indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge Burns

22  made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to

23  hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

24  because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[5]

25

26      [5] This point is underscored by Judge Burns's explanation to the Grand Jury that a
27  magistrate judge will have determined the existence of probable cause "in most circumstances"
    before it has been presented with any evidence. See Ex. A at 6. This instruction created an
28  imprimatur of finding probable cause in each case because had a magistrate judge not so found,
    the case likely would not have been presented to the Grand Jury for indictment at all. The Grand

1 See id. at 27. That is why even the "chance," see id., that a grand juror might not vote to indict was too great

2 a risk to run.

3     **2.**     **The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

4

5     In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

6 grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex.

7 A at 20.[6]

8         Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that

9         there's evidence out there that might cause you to say "well, I don't think

10 _____

11 Jury was informed that it merely was redundant to the magistrate court "in most circumstances."

12 See id. This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

13     [6] These instructions were provided in the midst of several comments that praised the

14 United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid,

15 they'll be honest, and . . . they'll act in good faith in all matters presented to you." See Ex. A at 27. The instructions delivered during voir dire go even further. In addressing a prospective

16 grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring,"

17 see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are

18 saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're

19 not about the business of trying to indict innocent people or people that they believe to be

20 innocent or the evidence doesn't substantiate the charges against.").

21     Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10.

22 Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases

23 for indictment where no probable cause existed.

24     In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the

25 U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's

26 independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice,"

27 see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand

28 jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

**B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[7] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

---

[7]    See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial."). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986). See id.

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

Id. (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed Vasquez's description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit. But not in Judge Burns's instructions.

1  **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established**
2       **in Both *Vasquez* and *Navarro-Vargas II*.**

3       The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand
4  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision
5  in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every
6  finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at
7  1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge Hawkins ably
8  pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use
9  of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand
10  jurors, and thus to circumscribe the grand jury's constitutional independence.").  See also id. ("The 'word'
11  should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide
12  1579 (1999) (brackets in original)).

13       The debate about what the word "should" means is irrelevant here; the instructions here make no such
14  fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not choose
15  not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree
16  with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting
17  even though I think that the evidence is sufficient'...."  See Ex. A at 8-9.  Thus, the instruction flatly bars the
18  grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would
19  read this language as instructing, or even allowing, him or her to assess "the need to indict."  Vasquez, 474
20  U.S. at 264.

21       While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether
22  an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that he could only
23  mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge Burns not
24  only told the jurors that they "should" indict if there is probable cause, he told them that if there is not
25  probable cause, "then the grand jury should hesitate and not indict."  See id. at 8.  At least in context, it would
26  strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand
27  jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205.  Clearly he was
28  not.

1    The full passage cited above effectively eliminates any possibility that Judge Burns intended the

2  Navarro-Vargas spin on the word "should."

3    [T]he grand jury is determining really two factors: "do we have a reasonable
     belief that a crime was committed?  And second, do we have a reasonable
4    belief that the person that they propose that we indict committed the crime?"

5    If the answer is "yes" to both of those, then the case should move forward.  If
     the answer to either of the questions is "no," then the grand jury should not
6    hesitate and not indict.

7  See Ex. B at 8.  Of the two sentences containing the word 'should," the latter of the two essentially states that

8  if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e]

9  room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at

10  1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting

11  the innocent.    See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

12  "responsibilities continue to include both the determination whether there is probable cause and the protection

13  of citizens against unfounded criminal prosecutions.") (citation omitted).

14    By the same token, if Judge Burns said that "the case should move forward" if there is probable cause,

15  but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-

16  Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended two

17  different meanings of the word "should" in the space of two consecutive sentences.  That could not have been

18  his intent. But even if it were, no grand jury could ever have had that understanding.[8]  Jurors are not presumed

19  to be capable of sorting through internally contradictory instructions.  See generally United States v. Lewis,

20  67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the

21  jury followed the correct one") (citation, internal quotations and brackets omitted).

22    Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

23  clear to the grand jurors that "should" was not merely suggestive, but obligatory:

24    (1)    The first occasion occurred in the following exchange when Judge Burns conducted voir dire

25  and excused a potential juror (CSW):

26  ————————————————————

27    [8] This argument does not turn on Mr. Alferes's view that the Navarro-Vargas/Marcucci
     reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on
28   the context in which the word is employed by Judge Burns in his unique instructions, context
     which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

1     The Court: . . . If there's probable cause, then the case should go forward. I
    wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't
2     like what the government is doing. I disagree with these laws, so I'm not going
    to vote for it to go forward." If that's your frame of mind, then probably you
3     shouldn't serve. Only you can tell me that.
    Prospective Juror: Well, I think I may fall in that category.
4     The Court: In the latter category?
    Prospective Juror: Yes.
5     The Court: Where it would be difficult for you to support a charge even if you
    thought the evidence warranted it?
6     Prospective Juror: Yes.
    The Court: I'm going to excuse you then.

7

8 See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective

9 juror. Even if the prospective juror did not like what the government was doing in a particular case, that case

10 "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that. See id. ("I

11 wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment

12 was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

13 the exercise of discretion by any other prospective grand juror.

14     (2)    In an even more explicit example of what "should" meant, Judge Burns makes clear that it

15 there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

16 Court   . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

17     You'd have a similar *obligation* as a grand juror even though you might have
    to grit your teeth on some cases. Philosophically, if you were a member of
18     Congress, you'd vote against, for example, criminalizing marijuana. I don't
    know if that's it, but you'd vote against criminalizing some drugs.
19

20     That's not what your *prerogative* is here. Your prerogative instead is act like
    a judge and to say, "All right. This is what I've got to deal with objectively.
    Does it seem to me that a crime was committed? Yes. Does it seem to me that
21     this person's involved? It does." *And then your obligation, if you find those*
    *things to be true, would be to vote in favor of the case going forward.*
22

23 Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives

24 were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were

25 convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded:

26 "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and

27 contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no

28 prerogative to do anything other than indict if there is probable cause.

1    Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

2    a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but

3    rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror could not

4    indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the

5    prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

6    scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the

7    prospective jurors, because his message is that there is no discretion not to indict.

8         (3)    As if the preceding examples were not enough, Judge Burns continued to pound the point home

9    that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is

10   that you follow the law that's given to us by the United States Congress. We enforce the federal laws here."

11   See id. at 61.

12        (4)    And then again, after swearing in all the grand jurors who had already agreed to indict in every

13   case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded

14   them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the

15   evidence is sufficient' . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law

16   ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

17        Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties

18   to which indicted persons may be subject.

19            Prospective Juror (REA): ... And as far as being fair, it kind of depends on
              what the case is about because there is a disparity between state and federal
20            law.
              The Court: In what regard?
21            Prospective Juror: Specifically, medical marijuana.
              The Court: Well, those things -- the consequences of your determination
22            shouldn't concern you in the sense that penalties or punishment, things like that
              -- *we tell trial jurors, of course, that they cannot consider the punishment or*
23            *the consequence that Congress has set for these things. We'd ask you to also*
              *abide by that.* We want you to make a business-like decision of whether there
24            was a probable cause. ...

25   See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause"

26   would obviously leave no role for the consideration of penalty information.

27        The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

28   penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See

1   United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two

2   reasons. First, Judge Burns did not use the term "should" in the passage quoted above. Second, that context,

3   as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

4   ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized

5   consideration of penalty information. See 474 U.S. at 263.

6        Nothing can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

7   again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

8   was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct

9   contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand

10  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

11  Vasquez:

12         The grand jury does not determine only that probable cause exists to believe
    that a defendant committed a crime, or that it does not. In the hands of the

13         grand jury lies the power to charge a greater offense or a lesser offense;
    numerous counts or a single count; and perhaps most significant of all, a

14         capital offense or a non-capital offense – all on the basis of the same facts.
    Moreover, "[t]he grand jury is not bound to indict in every case where a

15         conviction can be obtained."

16  474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

17  dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

18  initial decision to indict, but also significant decisions such as how many counts to charge and whether to

19  charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor

20  would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See

21  id. at 264. Judge Burns's grand jury is not Vasquez's grand jury. The instructions therefore represent

22  structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

23  jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must

24  therefore be dismissed. Id.

25       The Navarro-Vargas II majority's faith in the structure of the grand jury is not a cure for the

26  instructions' excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

27  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

28  decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may

1  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

2  independent." Id. at 1202 (emphases in the original).

3      Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

4  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

5  of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting).  The

6  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

7  making a probable cause determination ... unconstitutionally undermines the very structural protections that

8  the majority believes save[] the instruction." Id.  After all, it is an "'almost invariable assumption of the law

9  that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that

10 "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

11 in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

12 instructions because nothing will happen if they disobey them." Id.

13     In setting forth Judge Hawkins' views, Mr. Alferes understands that this Court may not adopt them

14 solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

15 Rather, she sets them forth to urge the Court *not to extend* what is already untenable reasoning.

16     Here, again, the question is not an obscure interpretation of the word "should", especially in light of

17 the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

18 Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the

19 right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both

20 Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

21     Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states

22 they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

23 prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex.

24 A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot embolden

25 grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience

26 of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury

27 exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government

28 by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 &

1  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own

2  initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge

3  Burns has both fashioned his own rules and enforced them.

4  **D.    The Instructions Conflict with Williams' Holding That There Is No Duty to Present
         Exculpatory Evidence to the Grand Jury.**

5

6      In Williams, the defendant, although conceding that it was not required by the Fifth Amendment,

7  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

8  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

9  common law.  See 504 U.S. at 45, 51.  Williams held that "as a general matter at least, no such 'supervisory'

10 judicial authority exists."  See id. at 47.  Indeed, although the supervisory power may provide the authority

11 "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

12 amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

13 Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it

14 does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."  Id.

15 at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

16 initiative, rules of grand jury procedure."  Id. at 50.  As a consequence, Williams rejected the defendant's

17 claim, both as an exercise of supervisory power and as Fifth Amendment common law.  See id. at 51-55.

18     Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would

19 present to them evidence that tended to undercut probable cause.  See Ex. A at 20.

20         Now, again, this emphasizes the difference between the function of the grand
           jury and the trial jury.  You're all about probable cause.  If you think that
21         there's evidence out there that might cause you say "well, I don't think probable
           cause exists," then it's incumbent upon you to hear that evidence as well.  As
22         I told you, in most instances, *the U.S. Attorneys are duty-bound to present
           evidence that cuts against what they may be asking you to do if they're aware*
23         *of that evidence.*

24 Id. (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

25 duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

26 [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  See

27 id. at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary."  See

28 Navarro-Vargas, 408 F.3d at 1207.

1    This particular instruction has a devastating effect on the grand jury's protective powers, particularly

2  if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

3  conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again,

4  the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

5  probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

6  would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they

7  should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

8  will present it. The end result, then, is that grand jurors should consider evidence that goes against probable

9  cause, but, if none is presented by the government, they can presume that there is none. After all, "in most

10  instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

11  you to do if they're aware of that evidence." See id. Moreover, during voir dire, Judge Burns informed the

12  jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or

13  that cuts against the charge, you'll be informed of that. *They have a duty to do that*." See Ex. B at 14-15

14  (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the

15  "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from

16  of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See

17  Ex. A at 27.

18    These instructions create a presumption that, in cases where the prosecutor does not present

19  exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no

20  exculpatory evidence was presented, would proceed along these lines:

21    (1)    I have to consider evidence that undercuts probable cause.

22    (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

23        evidence to me, if it existed.

24    (3)    Because no such evidence was presented to me, I may conclude that there is none.

25  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence

26  presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound

27  prosecutor would have presented it.

28  //

1    The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

2 prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

3 probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

4 of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

5 the Fifth Amendment.[9]

6                                               **IV.**

7                    **MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

8        Defense counsel has incomplete discovery at this time, and contemplates further motions once

9 discovery is received and reviewed with Mr. Alferes.  Therefore, counsel requests leave to file additional

10 motions once discovery is completed.

11 //

12 //

13 //

14 //

15 //

16 //

17 _____

18    [9] This Court recently ruled on a motion similar to that filed by Mr. Alferes.  See United

19 States v. Martinez-Covarrubias, Case No. 07CR0491-BTM, Order Denying Defendant's Motion to Dismiss the Indictment, dated October 11, 2007 (attached hereto as Exhibit J). While Mr.

20 Alferes disagrees with this Court's analysis, this Court at least recognized that a portion of the instruction is error, although incorrectly finding that it was not structural. Ex. J at 11. Because,

21 under this Court's prior analysis, this Court should determine whether the error was harmless, Mr. Alferes asks that this Court order the government to produce the transcripts of the grand jury

22 proceedings that resulted in the instant indictment.  The Court may order disclosure of grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss the

23 indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P.

24 6(e)(3)(E)(ii).  The Ninth Circuit requires a "particularized need" to justify disclosure, see United States v. Walczak, 785 F.2d 852, 857 (9th Cir. 1986), but that need cannot be any different than

25 the standard set for in Rule 6(e)(3)(E)(ii): Mr. Alferes need only show that "a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P.

26 6(e)(3)(E)(ii) (emphasis added).  That is why the Rule's "general suggestion [is] in favor of

27 disclosure."  See Walczak, 785 F.2d at 857.  Under this Court's approach to Judge Burns' erroneous instruction, it is clear that, at the very least, "a ground may exist to dismiss the

28 indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).

1

**V.**

2

**<u>CONCLUSION</u>**

3      For the foregoing reasons, Mr. Alferes respectfully requests that this Court grant the above requested

4    motions and leave to file further motions.

5                                              Respectfully submitted,

6

                                                <u>/s/ Elizabeth M. Barros</u>
7    Dated: May 30, 2008                        **ELIZABETH BARROS**
                                                Federal Defenders of San Diego, Inc.
8                                               Attorneys for Mr. Alferes

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

Counsel for Defendant certifies that a copy of the foregoing document has been served this day upon:

Paul L. Starita
Paul.Starita@usdoj.gov,debra.huntley@usdoj.gov,efile.dkt.gc1@usdoj.gov

Dated: May 30, 2008                                        Respectfully Submitted,


                                                           /s/ Elizabeth M. Barros
                                                           **ELIZABETH M. BARROS**
                                                           Federal Defenders of San Diego, Inc.
                                                           Attorneys for Mr. Alferes